UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARICELA UBIERA, as administrator of the
estate of Donny Ruben Ubiera,

*Plaintiff*,

-against-

THE CITY OF NEW YORK, CORRECTION
OFFICER SINCERE CROWELL, and CAPTAIN
ANGELO ERLAND LESSEY,

*Defendants*.

Case No. _____

**COMPLAINT AND
JURY DEMAND**

Plaintiff Maricela Ubiera as Administrator of the Estate of Donny Ruben Ubiera, by and through her attorneys, Emery Celli Brinckerhoff Abady Ward & Maazel LLP, for her Complaint, alleges as follows:

1.     This is a civil rights action brought on behalf of the estate of 33-year-old Donny Ruben Ubiera, who died on August 22, 2023, on Rikers Island because of Defendants' failure to provide him with the mental health services, care, and supervision that he needed.

2.     Mr. Ubiera arrived at Rikers Island after being arrested in June 2022. During his intake assessment, he disclosed a history of psychiatric illness and treatment, including for past suicidality and depression, as well as a history of significant substance use.

3.     Mr. Ubiera was found unfit to stand trial and admitted in October 2022 to Kirby Forensic Psychiatric Center, where he was diagnosed with and treated for schizophrenia. While at Kirby, Mr. Ubiera made significant improvements and became mentally stable.

4.     In March 2023, Mr. Ubiera was released back to Rikers and assigned to a mental observation housing area in the Anna M. Kross Center, where he remained for six weeks.

5.      Mr. Ubiera was transferred to the George R. Vierno Center ("GRVC") in May 2023, where he was again assigned to a series of mental observation ("MO") units over the next three months, all of which were supposed to provide the clinical services and close supervision that people with mental illness need.

6.      As the months wore on, Mr. Ubiera's mental health deteriorated. He struggled to remain compliant with his prescribed psychotropic medications and began taking illicit drugs that he obtained through the prison black market. He tried to choke himself in his cell several times with his sheet or towel in front of correction officers, and when he told them that he wanted to kill himself, their response was merely to tell Mr. Ubiera to unwrap the sheet from around his neck.

7.      During the months of Mr. Ubiera's deterioration, Rikers staff failed to provide the consistent mental health treatment and supervision that they knew he desperately needed, causing him to deteriorate even further.

8.      On August 21, 2023, Mr. Ubiera obtained methadone from another incarcerated individual in his MO unit. The methadone was not prescribed to Mr. Ubiera.

9.      During the day, Mr. Ubiera ingested methadone in the common areas of the housing unit in full view of the guards and other incarcerated individuals. The guards did nothing.

10.     Rikers staff knew or should have known that incarcerated individuals in the MO unit were able to obtain large quantities of illicit methadone, that it was widely available in the unit, and that this created a dangerous situation for those in their custody, but they did nothing to rectify the situation.

11.     Mr. Ubiera spent the evening of August 21 alone in his cell.

12.    At around 1:30 a.m. on August 22, 2023, other incarcerated individuals in Mr. Ubiera's housing unit heard him banging on his cell door and calling for help. Neither Defendant Officer Crowell nor any other Department of Correction ("DOC") staff responded.

13.    At 5:00 a.m. on August 22, 2023, Defendant Officer Crowell began the morning lock-out process, ordering people to come out of their cells for breakfast. Mr. Ubiera did not exit his cell. Defendant Officer Crowell went into Mr. Ubiera's cell and found him unresponsive.

14.    Despite his CPR certification having expired three years prior, Defendant Officer Crowell began performing CPR on Mr. Ubiera.

15.    As Mr. Ubiera lay there, unresponsive, another officer went to retrieve naloxone (a medication used to reverse opioid overdoses, also commonly known as Narcan) from the correction officers' station. In violation of DOC's directives requiring Narcan in every housing unit, there was no Narcan at the station.

16.    One of the correction officers had to travel to another housing area in search of Narcan. By the time the officer returned with the life-saving medication, it had been approximately 10 minutes since Defendant Officer Crowell found Mr. Ubiera unresponsive.

17.    After 40 minutes of futile CPR and belated injections of Narcan by correction officers, Mr. Ubiera was pronounced dead at 5:51 a.m. on August 22, 2023.

18.    After performing an autopsy, the OCME concluded that the cause of Mr. Ubiera's death was acute methadone intoxication.

19.    Mr. Ubiera's death was caused not only by the individual correction officers' deliberate indifference to his serious mental health and medical needs and their failure to properly supervise him—it was also the direct result of the City of New York's widespread and persistent policies, customs, and practices of deficient correctional care and supervision in its jails, the City

3

of New York's failure to train and supervise DOC staff and Correctional Health Services ("CHS") personnel, and the City of New York's deliberate indifference to DOC's failure to properly supervise mentally ill people in its care, deliberate indifference towards DOC's failure to prevent the illicit distribution and use of methadone that the City knew caused a serious risk of overdose and death amongst the prison population, and deliberate indifference towards CHS personnel's failure to provide adequate medical care to incarcerated people with serious medical needs.

20.     Mr. Ubiera's suffering and ultimate death were preventable and needless. Defendants' actions were contrary to law, contrary to sound correctional and medical practice, and contrary to the norms of a civilized society. This Complaint, arising from Mr. Ubiera's tragic death, seeks to hold Defendants accountable for their violations of Mr. Ubiera's constitutional rights.

## PARTIES

21.     Plaintiff is Maricela Ubiera, the mother of Donny Ruben Ubiera. Ms. Ubiera duly applied to the Queens County Surrogate's Court to be appointed the administrator of the estate of Donny Ruben Ubiera for the purposes of bringing this action. On December 8, 2023, the Queens County Surrogate's Court issued Limited Letters of Administration for the estate of Donny Ruben Ubiera to Ms. Ubiera.

22.     Donny Ruben Ubiera was a citizen of the United States and resided at Rikers Island jail in Bronx County at the time these events occurred.

23.     Defendant the City of New York (the "City") is a municipal corporation that, through the New York City Department of Correction ("DOC"), operates a number of jails on Rikers Island, including the George R. Vierno Center ("GRVC"). DOC is responsible for the provision of medical care and services to prisoners confined in the City jails, including the jails in which Mr. Ubiera was confined between March 29, 2023, and August 23, 2023.

24.    DOC, through its senior officials at the central office and in each jail facility, promulgates and implements policies, including those with respect to the provision of correctional care, the provision of healthcare, and access to medical and other program services mandated by local law and court orders. In addition, senior officials at DOC are aware of and tolerate certain practices by subordinate employees in the jails, including those that are inconsistent with formal policy. Because they are widespread, longstanding, and deeply embedded in the culture of the agency, these practices constitute unwritten DOC policies, customs, or practices. DOC is also responsible for the appointment, training, supervision, and conduct of all DOC personnel, including the individual Defendants referenced herein.

25.    At all times relevant, Correction Officer Sincere Crowell was employed by the DOC and assigned to the GRVC.

26.    At all times relevant, Captain Angelo Erland Lessey was employed by the DOC and assigned to the GRVC.

27.    At all times relevant, Defendants Officer Crowell and Captain Lessey (the "Individual Defendants") were officers of the DOC, who participated in and/or had knowledge of the failure to provide necessary medical care and supervision to Mr. Ubiera on August 21, 2023, and August 22, 2023. At all times relevant, the Individual Defendants were acting under color of state law and within the scope of their capacities as agents, servants, and employees of Defendant City. The Individual Defendants are sued in their individual capacities.

28.    Mr. Ubiera's mother, Maricela Ubiera, acting as the putative administrator of Mr. Ubiera's estate, served a Notice of Claim on the City on behalf of Mr. Ubiera's estate on October 17, 2023, and was appointed administrator on December 8, 2023.

29.     The City subsequently conducted an examination pursuant to General Municipal Law § 50-H on January 24, 2024.

30.     At least thirty days have passed since the Notice of Claim was served on the City, and adjustment and payment thereof has been neglected or refused by the City.

## JURISDICTION AND VENUE

31.     This action arises under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, and New York State law.

32.     This Court has subject matter jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because Plaintiff's claims arise under the laws of the United States, namely 42 U.S.C. § 1983, and seek redress of the deprivation, under color of state law, of rights guaranteed by the Constitution of the United States.

33.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

34.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant City of New York resides in this judicial district and the acts complained of occurred in this judicial district.

## JURY DEMAND

35.     Plaintiff demands trial by jury in this action.

## STATEMENT OF FACTS

36.     Donny Ruben Ubiera grew up in Queens, New York. He was his parents' only child, and his family was very close. Growing up, he collected sneakers, played sports, and liked cars.

37.    As an adult, Mr. Ubiera began to struggle with addiction and to experience symptoms of mental illness. He was hospitalized for psychiatric treatment and attended both in-patient and out-patient treatment for substance abuse. He was also incarcerated multiple times by the New York City Department of Correction and the New York State Department of Corrections.

***Donny Ubiera Arrives at Rikers***

38.    In June 2022, Mr. Ubiera was arrested and charged with attempted murder in the second degree and assault in the second degree. After bail was set at his criminal court arraignment, Mr. Ubiera was sent to Rikers Island.

39.    Once Mr. Ubiera arrived at Rikers, he was referred for a mental health assessment. During that assessment, Mr. Ubiera disclosed a significant substance use history of alcohol, cannabis, cocaine, and K2, and that he had previously been hospitalized for psychiatric treatment.

40.    The DOC intake assessment documented Mr. Ubiera as having a severe cocaine use disorder, cocaine-induced anxiety disorder, and alcohol use disorder. Mr. Ubiera also tested positive for cocaine at his initial admission into DOC custody.

41.    While at Rikers that summer, Mr. Ubiera missed multiple psychiatric and mental health care visits with Correctional Health Services ("CHS") because DOC failed to produce him and because of CHS staffing issues.

***Mr. Ubiera's Condition Improves with Proper In-Patient Care***

42.    In October 2022, pursuant to Section 730.50 of the New York Criminal Procedure Law, Mr. Ubiera was hospitalized at Kirby Forensic Psychiatric Center, in the care of the New York State Office of Mental Health, because he was confused, disorganized, unable to work with his legal team, and found unfit to stand trial.

43.    While at Kirby, Mr. Ubiera was diagnosed with schizophrenia. He was prescribed medication—the maximum dosage of Depakote and a high dosage of Olanzapine, an antipsychotic drug—which was administered to him by nursing personnel, and he was provided with individualized therapeutic treatment.

44.    Mr. Ubiera's parents, Maricela and Adonay Ubiera, visited him weekly. They brought him homemade meals and spent quality time with him. They also spoke to him on the phone almost every day while he was at Kirby.

45.    Mr. Ubiera's condition improved during his hospitalization, and by March 2023, he was evaluated as fit to stand trial. In the weeks before he was transferred back to Rikers, Kirby staff described Mr. Ubiera as "doing good" and as a "cheerful" member of the community.

### Once Back at Rikers, Mr. Ubiera's Mental Health Deteriorates

46.    On March 29, 2023, Mr. Ubiera was transferred back to DOC's custody, care, and control at Rikers Island, where he remained until his death on August 22, 2023.

47.    During intake back at Rikers, Mr. Ubiera underwent a psychiatric assessment and again disclosed that he had used alcohol, cannabis, K2, and cocaine prior to his arrest. This time, he tested negative for cocaine.

48.    When Mr. Ubiera arrived at Rikers in March 2023, he did not use opioids, suboxone, or methadone.

49.    Mr. Ubiera was not prescribed methadone at any point during his DOC incarceration.

50.    Due to his diagnosis of schizophrenia and previous substance use, Mr. Ubiera was referred for further treatment for mental illness and assigned to a mental observation ("MO") unit

in the Anna M. Kross Center, where he was housed for the next six weeks. He was again prescribed high doses of psychotropic medication.

51.     On May 9, 2023, Mr. Ubiera was transferred to the GRVC. Over the next three months, he was moved between three MO units within GRVC.

52.     Mental observation units house people who, according to DOC, need "structured support" and "more frequent observation." These units are meant to be overseen by a team of providers who conduct frequent rounds, provide programming, and oversee medication administration and compliance.

53.     Mr. Ubiera's mental health steadily declined over the course of his incarceration at GRVC until his death on August 22, 2023.

54.     On June 1, 2023, Mr. Ubiera was initially reported to have "excellent compliance" with his medication regimen, and he presented as a "low risk of danger to himself."

55.     Two weeks later, Mr. Ubiera's condition deteriorated so severely that he was placed in Program for Accelerating Clinical Effectiveness ("PACE"), an intensive mental observation program for "individuals with serious mental illness who require intensive support" and who "struggle to function adequately while incarcerated due to chronic mental illness" or due to "risk of acute psychiatric decompensation."

56.     However, at the end of June 2023, Mr. Ubiera was inexplicably taken out of PACE and downgraded to the lower level of mental observation that he was receiving at the beginning of June. He was downgraded to the lower level of observation even though CHS providers noted at the time that Mr. Ubiera had been yelling from his cell at night.

57.     In late June, Mr. Ubiera began to isolate himself from others in his unit—a telltale sign that he was struggling—but correction officers and CHS personnel ignored the signs.

58.    When Mr. Ubiera called his parents from Rikers, he sounded sadder than he had been at Kirby. As time went on, he sounded like he had lost hope.

59.    At some point after June 29, 2023, Mr. Ubiera's condition deteriorated further when he was observed throwing out his medication. Although a staff pharmacist recommended that his medications be crushed and administered in liquid form to ensure that Mr. Ubiera took his necessary psychotropic medications, as of August 1, 2023, Mr. Ubiera reportedly continued to throw out his medication.

60.    During the summer of 2023, Mr. Ubiera often obtained illicit drugs, such as K2, from other people in his housing unit. He used those drugs openly in front of correction officers in his unit.

61.    Mr. Ubiera frequently screamed in distress at night.

62.    He told other people in his unit that he was depressed, and that he might kill himself.

63.    Mr. Ubiera attempted to kill himself multiple times by putting a sheet over his door to obstruct the cell window and choking himself with a sheet or a towel.

64.    When he tried to commit suicide, Mr. Ubiera told correction officers that he wanted to kill himself. They responded merely by instructing him to take the sheet off his neck.

65.    Mr. Ubiera was not placed on suicide watch at any point during his incarceration at Rikers. Had he been placed on suicide watch, he would have been under constant supervision and observation by correction officers, and mental health and medical staff would have made daily visits to see him in his housing area.

66.    Despite the obvious signs that Mr. Ubiera was in distress, depressed, suicidal, non-compliant with his prescribed psychotropic medications, and using illicit drugs, none of the Rikers guards and staff in the MO unit or the CHS medical providers who were responsible for his mental

and physical well-being placed him on suicide watch, upgraded him to a program like PACE, or sought outside medical or mental health treatment for Mr. Ubiera.

***Mr. Ubiera Overdoses on Methadone in His Cell Hours After Calling for Help***

67.    On the afternoon of August 21, 2023, while still held in a mental observation housing unit at GRVC, Mr. Ubiera bartered some food from the commissary for a milk carton containing liquid methadone from another incarcerated individual in the unit.

68.    Mr. Ubiera drank the substance that was in the milk carton throughout the day and at dinner in plain sight of the guards.

69.    The carton contained liquid methadone that had been prescribed and dispensed to people in DOC custody.

70.    People in DOC custody regularly "cheek" or otherwise avoid swallowing liquid methadone when it is dispensed to them to save it to trade or sell to other people in custody.

71.    Methadone overdose is a life-threatening condition.

72.    Mr. Ubiera entered his cell at around 6:30 p.m. on August 21, 2023. He did not come out again.

73.    At 9:00 p.m. that night, Defendant Officer Crowell began his tour, which was to last until 5:30 a.m. the next morning.

74.    At 9:44 p.m., Defendant Officer Crowell stopped during his tour at Mr. Ubiera's cell. He tapped on the door and looked in with a flashlight. A few minutes later, he left the housing area.

75.    At approximately 1:30 a.m. on August 22, 2023, other people in Mr. Ubiera's unit heard him banging on his cell door and screaming.

76.    No correction officer responded to Mr. Ubiera's cry for help.

77.    On information and belief, at some point after 1:30 a.m., Mr. Ubiera ingested an unknown quantity of methadone.

78.    At approximately 3:00 a.m., Defendant Captain Lessey arrived on post.

79.    Over the course of the night, Defendant Officer Crowell purportedly looked into Mr. Ubiera's cell with a flashlight multiple times, including at around 1:30 a.m., 2:15 a.m., and 3:15 a.m. on August 22, 2023.

80.    Defendant Captain Lessey conducted the 3:15 a.m. tour with Defendant Officer Crowell.

81.    At approximately 5:00 a.m. on August 22, 2023, Defendant Officer Crowell instructed the people in Mr. Ubiera's unit to exit their cells and line up for breakfast.

82.    Mr. Ubiera did not respond.

83.    Defendant Officer Crowell shouted out to Mr. Ubiera, then knocked and entered his cell at around 5:12 a.m.

84.    Mr. Ubiera was still unresponsive, so Defendant Officer Crowell announced a medical emergency and began administering CPR.

85.    Defendant Officer Crowell was last certified in CPR in June 2018, over five years prior. His certification was expired by three years.

86.    Another correction officer was on duty at the time as a suicide watch officer, and Defendant Officer Crowell called for his assistance.

87.    The suicide watch officer arrived and took over administering CPR while Defendant Officer Crowell went to the "A" station (where corrections officers are located when not on tour) to get Narcan.

88.     There was no Narcan at the station despite a DOC directive requiring Narcan in every housing area's station.

89.     Defendant Officer Crowell came back to Mr. Ubiera's cell and resumed CPR while the suicide watch officer went to another housing area to get Narcan. Defendant Captain Lessey entered Mr. Ubiera's cell as well.

90.     Over the next 15 minutes, Defendant Captain Lessey and Defendant Officer Crowell continued to administer CPR, along with a third correction officer.

91.     Correctional staff eventually administered three rounds of Narcan while awaiting medical staff.

92.     When the medical staff arrived at around 5:30 a.m., they administered two additional rounds of Narcan, used a LUCAS machine (for automated chest compressions), and an AED machine (a defibrillator) on Mr. Ubiera.

93.     The medical interventions were too late.

94.     Dr. Peter Wachtel pronounced Mr. Ubiera dead at 5:51 a.m. on August 22, 2023.

95.     According to the Office of the New York State Attorney General's Office of Special Investigation, based on the degree of rigor and body temperature at the time his death was pronounced, Mr. Ubiera's heart stopped around the time DOC staff discovered him.

96.     The official cause of Mr. Ubiera's death as determined by the New York City Office of Chief Medical Examiner ("OCME") was acute methadone intoxication.

97.     When Board of Corrections ("BOC") staff visited Mr. Ubiera's cell on August 22, 2023, after his death, his window was covered with linen, obstructing correction officers' view of his cell.



*Figures 1, 2 – Mr. Ubiera's Cell Window (Right Side) as Photographed by BOC Staff on August 23, 2023*

98.    Such obstruction is a "lapse in security practice[]" contrary to DOC Security Bulletin #001/13, Cell Window Obstruction/Officer Safety, which prohibits people in custody from covering their cell window or otherwise obstructing correctional staff's observations of a person in custody.

99.    Cell window obstructions create a substantial risk to the health and safety of incarcerated people with mental illness like Mr. Ubiera, who are at heightened risk of self-injury or overdose.

100.    Defendants Officer Crowell and Captain Lessey had knowledge of this substantial risk to Mr. Ubiera's health and safety because they knew or should have known that (a) he was housed in an MO unit that was supposed to provide care and supervision suitable for people with mental health needs, (b) he was known to scream in distress at night, (c) he screamed in distress at around 1:30 a.m. on August 22, 2023, (d) people incarcerated in Mr. Ubiera's unit frequently and

openly traded and used illicit drugs and medication, (e) he previously covered his cell window when he tried to commit suicide by choking himself with a towel or sheet, and (f) DOC policy required rounds and active supervision of Mr. Ubiera's unit, as well as the removal of cell window obstructions, because there was a heightened risk of self-injury or overdose to incarcerated people with mental health needs.

101.    After Mr. Ubiera died, Defendant Officer Crowell claimed that, upon assuming his post on August 21, 2023, he instructed all people in the housing unit to remove obstructions from their cell windows, and that everyone complied, including Mr. Ubiera. This claim is contradicted by BOC's photographs.

102.    If Mr. Ubiera had in fact complied—or if Defendants Officer Crowell and Captain Lessey had properly conducted tours "consistent with policy" throughout the night—Mr. Ubiera's window would not have been found covered on the morning of August 22, 2023.

103.    Defendants Officer Crowell and Captain Lessey were required to but failed to remove the obstruction. Either they failed to conduct tours over the course of the night, or they did conduct tours, saw Mr. Ubiera's obstructed window, and decided not to act. As a result, no one discovered that Mr. Ubiera was in medical distress before it was too late. This deliberate indifference caused Mr. Ubiera's death.

***The Board of Correction Investigates Mr. Ubiera's Death***

104.    The New York City Board of Correction ("BOC") is the City agency that regulates, monitors, and inspects City correctional facilities.

105.    The BOC is required by statute to investigate the circumstances of all in-custody deaths at City correctional facilities.

106.    The BOC investigated Mr. Ubiera's death.

107.    As part of its investigation, BOC staff interviewed people in custody and staff, and reviewed video footage, DOC records, medical records, OCME records, and press coverage.

108.    On February 9, 2024, the BOC published its Second Report and Recommendations on 2023 Deaths in New York City Department of Correction Custody (the "2023 BOC Report").

109.    Nine people died in DOC custody in 2023, including one by suicide and three by acute drug intoxication or overdose.

110.    The 2023 BOC Report discussed four of the nine deaths.

111.    The 2023 BOC Report included the BOC's findings regarding Mr. Ubiera's in-custody death.

112.    In all four deaths summarized in the 2023 BOC Report, including Mr. Ubiera's, "the decedents covered their cell windows completely, obstructing the correction officer's view."

113.    The BOC recommended that "housing area correctional staff must instruct individuals to remove all cell window obstructions. If verbal commands to remove all coverings does not take its [sic] desired effect, staff must immediately notify a supervisor and document the encounter in their logbook. Upon receiving notification, a DOC supervisor must physically remove the coverings. Uniformed supervisory staff must regularly monitor housing areas and audit logbooks to ensure staff follow protocol."

114.    The BOC further noted that logbook entries on the day that Mr. Ubiera died "lack information about DOC and medical staff's effort to resuscitate him."

115.    The BOC also observed that, according to CHS, the Narcan supply in the building where Mr. Ubiera was housed at the time of his death had been audited on July 11, 2023, and at that time, there were two Narcan kits in place.

16

116.    CHS records reflected no Narcan replenishment requests from DOC between July 11, 2023, and August 22, 2023, the day when Defendant Officer Crowell was unable to find Narcan in Mr. Ubiera's housing area to try and resuscitate him.

117.    Pursuant to DOC's directive on Narcan, which was effective June 30, 2022, Narcan kits were to be available in all housing area stations.

118.    The BOC concluded that DOC "must continually train and enforce" officers' obligation "to request replenishment of Narcan . . . when the remaining kits are expired or used."

119.    The BOC also noted that Defendant Officer Crowell, who performed CPR on Mr. Ubiera, did not have an active CPR certification on August 22, 2023, and that, as such, he was technically prohibited from using CPR techniques under Operations Order #111/16.

120.    Additionally, according to the BOC, the tour commander took over one hour to report Mr. Ubiera's death to DOC's Central Operations Desk, which is in charge of receiving and disseminating information about unusual incidents within DOC.

121.    DOC policy requires deaths or serious injuries of people in custody be reported to the Central Operations Desk within 15 minutes.

122.    It took over 15 minutes to report all four deaths discussed in the 2023 BOC Report to the Central Operations Desk.

123.    Moreover, according to the BOC, DOC leadership did not directly notify BOC members or staff of Mr. Ubiera's death. Instead, the BOC learned of his death through an email notification from the Central Operations Desk.

124.    With respect to the practice of trading methadone, the BOC concluded that "DOC must ensure that correctional staff conduct a thorough visual inspection of an individual's mouth

after they have received medication. This will help prevent an individual from hoarding medication and/or selling it to others."

125.    Similarly, the BOC called on DOC to "stop the flow of contraband into the jails, whether it be through mail, visitors, or uniformed and civilian staff."

126.    And, "[t]o ensure drugs are confiscated and do not cause harm to the population," the BOC concluded that "DOC must create a regular contraband search schedule that covers all housing units and areas where people in custody are held."

***The City's Widespread and Persistent Practice of Failing to Prevent the Flow of Contraband and Trade of Medications at Rikers***

127.    Correction officers and CHS staff who administer and supervise the administration of methadone to patients know that incarcerated individuals often "cheek" their methadone to sell to others, yet they make little to no attempt to stop the practice.

128.    Such methadone trade is common at Rikers, as is the trade of illicit drugs.

129.    Prior to Mr. Ubiera's death by methadone overdose, officials within DOC and the City of New York knew that illicit methadone was commonly traded within the prison walls due to staff's failure to properly supervise the administering of methadone.

130.    Prior to Mr. Ubiera's death by methadone overdose, officials within DOC and the City of New York knew that the illicit methadone trade and use in the City jails created a risk of overdose and death to incarcerated individuals.

131.    Over two years before Mr. Ubiera died, in June 2021, DOC correction officers watched 34-year-old Jose Mejia Martinez die of a methadone overdose in his cell at GRVC.

132.    Mr. Mejia Martinez had not been prescribed methadone but had been given the drug by others incarcerated at GRVC, just like Mr. Ubiera.

133.    At the time of Mr. Ubiera's death, the widespread and persistent practice among DOC staff, including correction officers, was to ignore—and to participate in—the trade of illicit drugs at Rikers, rather than interrupt and prevent the flow of contraband within the jails.

134.    At the time of Mr. Ubiera's death, the widespread and persistent practice among CHS personnel and DOC staff, including correction officers, was to fail to supervise the administration and consumption of prescribed medications such as methadone.

135.    Prior to Mr. Ubiera's death, the City had notice of DOC staff's widespread and persistent practice of failing to stop the trade and use of illicit drugs at Rikers.

136.    Prior to Mr. Ubiera's death, the City had notice of CHS personnel's and DOC staff's widespread and persistent practice of failing to properly supervise the administration and consumption of prescribed medications like methadone to prevent its trade and recreational use.

137.    The 2023 BOC Report was not the first time that the BOC had warned of the danger posed by the flow of drugs and illicitly traded medications in DOC facilities.

138.    In September 2022, less than a year before Mr. Ubiera's death, the BOC issued a report on suicides and drug-related deaths in DOC custody, which advised that "[t]he prevalence of drugs [at Rikers], often laced with fentanyl, combined with deficient supervision and reduced staffing, threatens the lives of those in custody on a daily basis."

139.    The BOC cited the City's own reporting, which noted that "banned drugs were seized within the [City's] jails more than 2,600 times between April 2020 and May 2021, more than double the seizures from April 2018 and May 2019, when the [jail population] was higher."

140.    In December 2022, reporting described "the flow of drugs into Rikers Island" as a "major issue" exacerbated by "the culture of [DOC]." Correction officers did not consistently check DOC staff or civilians arriving at Rikers for contraband.

141.     Similarly, a DOC investigator testified in 2022 that DOC staff frequently smuggled contraband into Rikers in exchange for monetary bribes, including by people incarcerated at Rikers who then resold the drugs within the facility.

142.     According to an October 28, 2022 Status Report (the "2022 Status Report") filed by the independent monitor appointed by a judge of this Court to oversee the City's compliance with its Consent Judgment in *Nunez v. City of New York* concerning conditions of confinement at Rikers (the "*Nunez* Independent Monitor"), in 2022, the "number of deaths [at Rikers], particularly those due to suicide and drug overdoses, [was] deeply troubling."

143.     The *Nunez* Independent Monitor concluded that "many of these deaths were at least partly attributable to poor security practices," including "ineffective searching" and "potential staff inaction."

144.     The *Nunez* Independent Monitor noted also that the "precipitous[]" rise in in-custody deaths was "related, at least in part, to the convergence of poor operational and clinical practices, inadequate supervision, and management failures that have characterized the day-to-day operation of the jails for decades."

145.     Only three days after the 2022 Status Report was filed, on October 31, 2022, 26-year-old Gilberto Garcia died of a fentanyl overdose at Rikers. He was found unresponsive in his cell, like Mr. Ubiera.

146.     And less than two months after Mr. Ubiera's death, on October 5, 2023, another man incarcerated at Rikers, Manish Kunwar, likewise died of a methadone overdose, having ingested a significant amount of methadone in his cell. He was 27 years old.

147.     That same day, the *Nunez* Independent Monitor emphasized in a Status Report (the "October 2023 Status Report") that "[DOC] records, video evidence, leadership reports, and first-

hand observations by the Monitoring Team reveal ongoing and rampant drug use among people in custody."

148.    In one week between September 11 and September 17, 2023, five individuals in New York DOC custody required Narcan administration.

149.    In 2023, DOC recovered illegal drugs at Rikers over 1,200 times.

150.    But DOC had not conducted an institutional search of Mr. Ubiera's housing unit for over a month before he died.

151.    The flow of contraband at Rikers has persisted since Mr. Ubiera's death. In May 2024, a search at Rikers uncovered a large cache of illicit drugs, including cocaine, K2, fentanyl-soaked paper, and marijuana.

152.    A former DOC deputy commissioner concluded, based on the sheer volume of drugs found, that DOC staff were likely involved in smuggling the drugs into Rikers.

153.    Despite the BOC's reiteration over the last four years that "DOC must stop the flow of contraband into the jails," DOC has failed to do so.

154.    The DOC staff's widespread and persistent failure to interrupt and stop the flow of contraband and to supervise the administration and consumption of prescribed medication to prevent its trade and recreational use, and its deliberate indifference towards same, has had lethal consequences for people incarcerated at DOC correctional facilities, including people with mental illness like Mr. Ubiera.

***The City's Widespread and Persistent Practice of Inadequate Correctional Care and Security Practices by DOC Staff, Including Failure to Remove Cell Window Obstructions***

155.    Formal DOC policy prohibits incarcerated people from covering their cell windows or otherwise creating an obstruction of correctional staff's ability to observe them.

156.    The enforcement of this policy is especially critical in a mental observation unit, where people with serious mental health needs may obstruct their cell windows in order to attempt self-harm or use illicit drugs.

157.    In practice, DOC staff, including correction officers, do not follow this policy when supervising incarcerated people.

158.    It is well known by DOC supervisors and officials within the agency's administration that DOC staff consistently fail to remove obstructions from cell windows, including in mental observation units.

159.    DOC acknowledges that incarcerated people with mental health needs require a higher level of care than others in its custody.

160.    MO units, like the one at GRVC where Mr. Ubiera was housed at the time of his death, are designed to provide such heightened level of care and supervision for the special needs of individuals held in those units.

161.    Despite the stated purpose of these special MO units, DOC officers routinely fail to provide the level of care and supervision needed for the safety and well-being of people housed there.

162.    It is well known by DOC supervisors and officials within the agency's administration that DOC staff consistently fail to provide adequate care and supervision to those in their custody, including individuals housed in mental observation units.

163.    At the time of Mr. Ubiera's death, DOC staff persistently failed to adequately monitor or supervise housing areas and care for individuals in their custody, including a failure to enforce DOC policy to remove any cell window obstructions.

164.    Prior to Mr. Ubiera's death, the City had notice of DOC staff's widespread and persistent practice of failure to adequately monitor or supervise housing areas and care for individuals in their custody.

165.    On February 27, 2022, 38-year-old Tarz Youngblood died while incarcerated at GRVC. DOC staff became aware of his medical crisis only after he was carried out of a cell, unconscious.

166.    The cell Mr. Youngblood was in prior to his death had not been checked for hours before his death, and the window of the cell was obstructed by a white or grey covering.

167.    Mr. Youngblood's death was one of the many deaths in New York DOC custody that the 2022 Status Report found "were at least partly attributable to poor security practices," noting in particular "inadequate touring by staff," "failures in ensuring the removal of sight obstructions, such as cell window coverings," and broad "operational deficiencies."

168.    Generally, the *Nunez* Independent Monitor described a "prevalence of poor practice" by DOC staff, including "[p]ractices that lack adherence to basic security protocols" and "poor situational awareness and lack of vigilance while on post."

169.    The 2022 Status Report described DOC culture as "entrenched" and "depart[ing] . . . remarkably from sound practice."

170.    The *Nunez* Independent Monitor filed a subsequent Status Report on April 3, 2023 (the "April 2023 Status Report"), reaffirming these concerns.

171.    The April 2023 Status Report described ongoing security and operational failures at Rikers facilities, where, "during the Monitoring Team's routine site visits, it was not uncommon for the Monitoring Team to enter a housing area with clear security lapses—for example door

manipulations and obstructions, and individuals congregated in unauthorized areas—while a review of logbook entries revealed a recent supervisor's tour that noted 'no issues.'"

172.   Less than five months before Mr. Ubiera died, the *Nunez* Independent Monitor concluded that its "extensive findings regarding poor security practices . . . [were] essentially unchanged Department-wide."

173.   On July 10, 2023, the *Nunez* Independent Monitor filed another Report (the "July 2023 Status Report").

174.   The July 2023 Status Report emphasized that, "to date," DOC "[had] not meaningfully implemented sustainable solutions to *any* of the immediate problems" present in DOC's practices.

175.   DOC staff's "apathetic approach to basic security practices" was "evidence of the deep inadequacies of the basic security function of the jails."

176.   The July 2023 Status Report described multiple instances of GRVC cell doors being "open, unsecured, manipulated, and obstructed," and incarcerated people "openly smoking contraband."

177.   On July 15, 2023, just over a month before Mr. Ubiera's death, 47-year-old William Johnstone died while incarcerated at GRVC. Mr. Johnstone was discovered unconscious in his cell.

178.   The cell Mr. Johnstone was in prior to his death had not been checked for at least an hour before his death, and the window of his cell was obstructed by magazine clippings.

179.   Only one week after Mr. Johnstone's death, on July 23, 2023, 44-year-old Curtis Davis died while incarcerated at GRVC. Mr. Davis died by suicide in his cell, which had not been checked for over three hours before correction officers manually unlocked his cell and found him.

180. The window of Mr. Davis's cell was completely obstructed, and the correction officer on duty had not instructed Mr. Davis to remove the obstruction, nor did the officer take steps to have the obstruction removed.

181. DOC's failures have persisted after Mr. Ubiera's death. The October 2023 Status Report emphasized that the "jails remain dangerous and unsafe, characterized by a pervasive, imminent risk of harm to both people in custody and staff."

182. The *Nunez* Independent Monitor warned of DOC's "continuing lack of urgency to address basic security practices," and "a growing level of abdication of control on the housing units."

183. Visiting a GRVC housing area to prepare the October 2023 Status Report, the *Nunez* Independent Monitor found that "[n]early every single door was either manipulated with a towel or had a window obstructed. . . . The Captain we toured with banged on the doors, and when a PIC responded, she would move to the next door but she did not visually confirm their wellbeing."

184. The October 2023 Status Report concluded that, even when DOC staff do tour the housing units they are responsible for, "[the tours] are often perfunctory, and there is limited enforcement to ensure that obstructions on cell windows and door manipulations are removed. These obstructions make it impossible for staff to visually confirm the well-being of individuals, which renders the tour pointless."

185. DOC staff's failure to follow policy and to supervise and care for incarcerated people adequately, and deliberate indifference towards same, has had predictably deadly outcomes for those incarcerated in DOC correctional facilities, including Mr. Ubiera.

**COUNT ONE**
**42 U.S.C. § 1983**
**(Against the Individual Defendants)**

186.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

187.    By reason of the foregoing, and by failing to provide Mr. Ubiera with adequate supervision, failing to ensure Mr. Ubiera's safety, failing to prevent the flow of contraband, failing to prevent the trade of medications, failing to provide medical treatment, and exhibiting deliberate indifference to Mr. Ubiera's safety, the Individual Defendants acted with deliberate indifference to Mr. Ubiera's serious medical needs and safety, thereby depriving him of his rights, privileges, and immunities guaranteed to every citizen of the United States in violation of 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourteenth Amendment to the United States Constitution.

188.    The Individual Defendants acted at all relevant times willfully, wantonly, maliciously, and/or with such reckless disregard of consequences as to reveal a conscious indifference to the clear risk of death or serious injury to Mr. Ubiera that shocks the conscience.

189.    The Individual Defendants acted at all relevant times under pretense and color of state law and in their individual and official capacities and within the scope of their respective employments as officers, agents, employees, and/or contracted personnel of Defendant City. Said acts by the Individual Defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers.

190.    The Individual Defendants acted willfully, knowingly, and with the specific intent to deprive Mr. Ubiera of his constitutional rights secured by 42 U.S.C. § 1983 and by the Fourteenth Amendment to the United States Constitution.

191.    As a direct and proximate result of these violations of Mr. Ubiera's constitutional rights, he suffered the damages hereinbefore alleged.

**COUNT TWO**
**42 U.S.C. § 1983**
**(Against Defendant City of New York)**

192.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

193.    At the time of Mr. Ubiera's incarceration and death in DOC custody, Defendant City permitted, tolerated, and was deliberately indifferent to a widespread and persistent policy, custom, or practice of medical neglect, deliberate indifference, and negligence by DOC officers, agents, and employees towards the serious medical needs of incarcerated people, including incarcerated people with mental illness and/or histories of substance abuse.

194.    At the time of Mr. Ubiera's incarceration and death in DOC custody, Defendant City permitted, tolerated, and was deliberately indifferent to a widespread and persistent policy, custom, or practice of medical neglect, deliberate indifference, and negligence by CHS personnel towards the serious medical needs of incarcerated people, including incarcerated people with mental illness and/or histories of substance abuse.

195.    At the time of Mr. Ubiera's DOC incarceration and death in DOC custody, Defendant City also permitted, tolerated, and was deliberately indifferent to the DOC's widespread and persistent policy, custom, or practice of inadequate supervision and care of incarcerated individuals, including failure to remove cell window obstructions, failure to prevent the flow of contraband, and failure to prevent the trade of medication.

196.    This widespread and persistent policy of inadequate supervision and care of incarcerated people exacerbated the deadly effects of the DOC's policy, custom, or practice of

medical neglect, deliberate indifference, and negligence by DOC officers, agents, and employees towards the serious medical needs of incarcerated people, including incarcerated people with mental illness.

197.    Defendant City exhibited deliberate indifference to the serious medical needs of incarcerated people, including incarcerated people with mental illness, by, among other things:

a.  Failing to ensure that DOC officers, agents, and employees conduct proper supervision of incarcerated people, including in mental observation units;

b.  Failing to ensure that CHS personnel provide adequate medical care to incarcerated people in DOC custody;

c.  Failing to ensure adequate supervision for people in DOC custody who suffer from mental illness;

d.  Failing to supervise DOC officers, agents, and employees who were responsible for treating or responding to the serious medical needs of incarcerated people;

e.  Failing to supervise CHS personnel who were responsible for treating or responding to the serious medical needs of incarcerated people;

f.  Failing to supervise DOC officers, agents, and employees who were responsible for supervising and caring for incarcerated people in DOC custody;

g.  Failing to train DOC officers, agents, and employees to provide appropriate care to incarcerated people with serious medical needs, including incarcerated people with mental illness; and

h.  Failing to train CHS personnel to provide appropriate care to incarcerated people with serious medical needs, including incarcerated people with mental illness.

198.    The City permitting, tolerating, and being deliberately indifferent towards CHS personnel's and DOC officers', agents', and employees' medical neglect, deliberate indifference, and negligence towards the serious medical needs of incarcerated people constituted a municipal and corporate policy, custom, or practice. This policy, custom, or practice was a direct and proximate cause of Mr. Ubiera's mistreatment and death, and Plaintiff's resultant damages, hereinbefore alleged.

199.    By permitting, tolerating, and acting with deliberate indifference towards DOC officers, agents, and employees' medical neglect, deliberate indifference, and negligence towards the serious medical needs of incarcerated people, the City deprived Mr. Ubiera of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

## COUNT THREE
### Negligence
### (Against All Defendants)

200.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

201.    At all relevant times, the City, through its officials, employees, agents, servants, and/or representatives, including the Individual Defendants, owed a duty to Mr. Ubiera to meet the standard of care owed to incarcerated people. The standard of care required, among other things, prompt and immediate treatment of Mr. Ubiera's mental illness, as well as adequate supervision and care of Mr. Ubiera.

202.    At all relevant times pursuant to this Complaint, the Individual Defendants failed to uphold this duty to Mr. Ubiera.

203.     By failing to provide Mr. Ubiera with adequate supervision, failing to ensure Mr. Ubiera's safety, failing to prevent the flow of contraband, failing to prevent the trade of medication, and/or failing to provide Mr. Ubiera medical treatment, the Individual Defendants demonstrated a complete disregard for Mr. Ubiera's life and safety, and thereby breached the duty owed to Mr. Ubiera.

204.     The actions of the Individual Defendants represent a gross deviation from the actions a reasonable individual would have taken in their position, given their knowledge and employment.

205.     The Individual Defendants were at all times relevant to this Complaint acting in their capacities as DOC officers and employees, and within the scope and course of their employment by the DOC, an agency of the City.

206.     A private employer would otherwise be liable for the negligence of the Individual Defendants. The City is therefore liable for the Individual Defendants' negligence under the doctrine of *respondeat superior*.

207.     Defendants' breach of their duty of care to Mr. Ubiera was the proximate cause of Mr. Ubiera's serious and unnecessary injuries, including severe pain and suffering and death.

208.     As a direct and proximate result of Defendants' acts and omissions detailed above, Mr. Ubiera suffered physical injury, severe pain and suffering, emotional distress, monetary damages, and death.

**COUNT FOUR**
**Wrongful Death**
**(Against All Defendants)**

209.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

210.    As a direct and proximate result of the Individual Defendants' acts and omissions detailed above, Mr. Ubiera suffered physical injury, severe pain and suffering, and death.

211.    As a direct and proximate result of the Individual Defendants' acts and omissions detailed above, the statutory distributees of Mr. Ubiera's estate sustained pecuniary and non-economic loss resulting from the loss of Mr. Ubiera's love, comfort, society, attention, services, income, support, and life.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

a.    Awarding compensatory damages in an amount to be determined at trial;

b.    Awarding punitive damages against the Individual Defendants in an amount to be determined at trial;

c.    Awarding Plaintiff reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

d.    Directing such other and further relief as the Court may deem just and proper, together with attorneys' fees, interests, costs, and disbursements of this action.

Dated: New York, New York
      November 15, 2024

                        EMERY CELLI BRINCKERHOFF
                        ABADY WARD & MAAZEL LLP

                        By: _____/s/_____
                            Julia P. Kuan
                            Katherine Rosenfeld
                            Sonya Levitova
                            600 Fifth Avenue, 10th Floor

New York, New York 10020
(212) 763-5000

*Attorneys for Plaintiff*